STATE OF CONNECTICUT *v.* GARY R. DAMATO
(AC 27129)

McLachlan, Harper and Lavine, Js.

Argued September 24, 2007—officially released January 22, 2008

*Gary R. Damato*, pro se, with whom were *Cyd O. Oppenheimer* and *Richard A. Reeve*, special public defenders, and, on the brief, *Michael O. Sheehan* and *George G. Kouros*, special public defenders, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *James E. Thomas*, former state's attorney, and *Michael A. Gailor*, executive assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Gary R. Damato, appeals from the judgment of conviction, rendered after a jury trial, of inciting injury to persons in violation of General Statutes § 53a-179a (a),[1] attempt to assault a prosecutor in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-167d (a),[3] and attempt to commit murder in

---

[1] General Statutes § 53a-179a (a) provides in relevant part: "A person is guilty of inciting injury to persons or property when, in public or private, orally, in writing, in printing or in any other manner, he advocates, encourages, justifies, praises, incites or solicits . . . the killing or injuring of any class or body of persons, or of any individual."

[2] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-167d (a) provides: "A person is guilty of assault of a prosecutor when such person, with intent to intimidate or harass, or

violation of General Statutes §§ 53a-49 (a) (2)[4] and 53a-54a.[5] On appeal, the defendant claims that the trial court improperly (1) denied his motion for a judgment of acquittal, (2) instructed the jury on the charge of inciting injury to persons, (3) failed to give a special instruction regarding the credibility of a jailhouse informant and (4) ruled on the admissibility of certain evidence. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that the defendant was plotting to assault or to murder Enfield prosecutor Christopher Parakilas. Parakilas had prosecuted the defendant's son in an unrelated narcotics case and, subsequently, had assisted in the prosecution of the defendant in an assault case. The defendant undertook certain steps in furtherance of his plan to assault or to murder Parakilas. He solicited his friend, Cord Campbell, to find a gun and to hire another individual to kill Parakilas for $5000. He followed Parakilas to Steve's Boston Seafood restaurant, reconnoitered Parakilas' place of residence and provided this information to Campbell. On November 14, 2002, Tommy Carbone, an acquaintance of both the defendant and the defendant's son, reported to the state police that he had overheard the defendant discussing over the telephone a "hit" on Parakilas. Over the next several days, Carbone engaged the defendant in taped conversations about Parakilas. An arrest warrant was issued, and the defendant was arrested on November 19, 2002. After the jury found him guilty on all counts, the court sentenced the defendant to twenty-one years incarceration.

to retaliate against, another person on account of the performance by such other person of such other person's duties as a prosecutor employed by the Division of Criminal Justice, causes physical injury to such other person."

[4] See footnote 2.

[5] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

## I

The defendant claims on appeal that the court improperly denied his motion for a judgment of acquittal because the state presented insufficient evidence to support his conviction of (1) attempt to commit murder and attempt to assault a prosecutor and (2) inciting injury to persons. The defendant argues that the state presented insufficient evidence to prove that he had taken a substantial step toward the commission of murder and assault of Parakilas. Specifically, he argues that the evidence presented could not establish that the defendant had followed Parakilas and reconnoitered Parakilas' residence. With respect to the charge of inciting injury to persons, the defendant contends that a jury reasonably could not have concluded that the defendant's conduct was likely to produce imminent lawless action. We disagree.

During the state's case-in-chief, Campbell, a friend of the defendant's for more than eight years, testified that the defendant was angry with Parakilas, the prosecutor in his son's trial, because he thought Parakilas was "riding his son." On five or six occasions in a span of three to four months, the defendant told Campbell that he wanted Parakilas "messed up" and wished that he could "f___ him up." Campbell also testified that shortly after the defendant's son was sentenced, the defendant asked Campbell to obtain a gun for the defendant. The defendant emphasized to Campbell more than once that he wanted "to get it done." When Campbell indicated that he could retain people to "get the job done," the defendant proposed to Campbell that he would pay $5000, with half of that amount as a down payment. The defendant provided Campbell with an address and a description of where Parakilas lived. He described the prosecutor's residence as having many bushes and as being on a dead-end street, across from railroad tracks and accessible by boat.

Campbell testified that initially he did not think that the defendant was serious. Throughout their friendship, the defendant often requested Campbell to "do this to someone [or] do that to someone," but the defendant had not persisted in those instances. Campbell became convinced that the defendant was serious about harming Parakilas, however, when the defendant offered money and provided a description of the residence.

On August 30, 2004, Michael Price encountered the defendant while both were in a holding cell in the judicial district of Hartford. Price recognized the defendant because he knew the defendant's son. The defendant explained to Price that he was at the court on charges of attempted assault and attempted murder of Parakilas. The defendant told Price that his son had been "screwed over" and sentenced to almost ten years incarceration. As a result, the defendant was angry with Parakilas, who prosecuted his son, and was going to kill him. The defendant also told Price that he had someone follow Parakilas to Steve's Boston Seafood restaurant in Enfield.

Defense counsel orally moved for a judgment of acquittal at the close of the state's case-in-chief and renewed this motion following the verdict. The defendant argued that the state did not present sufficient evidence to establish a time or factual "linkage" between the defendant's following of Parakilas to Steve's Boston Seafood restaurant and his conversations with Campbell and Carbone about his intent to cause injury to or to kill Parakilas, or to explain how the defendant obtained the information about Parakilas' residence. The defendant also argued that there was no substantial evidence to support a finding that criminal action was imminent. The court denied the defendant's motion.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence

in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Solomon*, 103 Conn. App. 530, 539, 930 A.2d 716 (2007).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask,

instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007).

We review each category of claimed insufficient evidence in turn and determine whether on the facts so construed the jury reasonably could have concluded that the evidence established guilt beyond a reasonable doubt.

A

The defendant first argues that the state presented insufficient evidence to support his conviction of attempt to commit murder and attempt to assault a prosecutor. He contends that the state failed to prove beyond a reasonable doubt that he had taken a substantial step in the commission of these crimes because the testimony of Campbell and Price was insufficient to establish that the defendant followed Parakilas and reconnoitered his residence. We disagree.

"There are two essential elements that the state must prove beyond a reasonable doubt to sustain a conviction of the crime of attempt to commit murder. First, the state must prove beyond a reasonable doubt that the defendant had the kind of mental state required for commission of the crime of murder. Second, the state must prove beyond a reasonable doubt that the defendant intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . . [T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Internal quotation marks omitted.) *State* v. *O'Neil*, 65 Conn. App. 145, 171,

782 A.2d 209 (2001), aff'd, 262 Conn. 295, 811 A.2d 1288 (2003); see also *State* v. *Wells*, 100 Conn. App. 337, 343–44, 917 A.2d 1008 ("the state bore the burden of proving beyond a reasonable doubt that the defendant [1] acted with the intent to cause serious physical injury to another person and [2] intentionally did or omitted to do anything which, under the circumstances as he believed them to be, was an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of assault"), cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007).[6]

Further, § 53a-49 (b) provides that, if strongly corroborative of the actor's criminal purpose, "[l]ying in wait, searching for or following the contemplated victim of the crime" or "reconnoitering the place contemplated for the commission of the crime" shall not be deemed insufficient to constitute a substantial step as a matter of law. At trial, the state presented Campbell's and Price's testimony for the purpose of showing that the defendant took a substantial step in the commission of the crime by following Parakilas and reconnoitering his place of residence. On appeal, the defendant argues that "following" must have a predatory thrust and requires proximity in space as well as in time.[7] The defendant maintains that the jury reasonably could not have concluded beyond a reasonable doubt that he followed Parakilas because neither Campbell nor Price testified to having seen the defendant in the proximity of Parakilas. We disagree.

---

[6] Even though this claim involves two separate offenses, attempt to commit murder and attempt to assault a prosecutor, we review them together, as the parties have done in their briefs.

[7] The defendant relies on *State* v. *Jackson*, 56 Conn. App. 264, 272, 742 A.2d 812, cert. denied, 252 Conn. 938, 747 A.2d 4 (2000), for the proposition that following, as an element of the crime, must have proximity in space and time. *Jackson*, however, involved a constitutional challenge to the stalking statutes, General Statutes §§ 53a-181d and 53a-181e. "Following," as articulated by *Jackson*, applies to the stalking statutes and not the attempt statute in the present case.

As we have stated, the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, but each fact underlying its conclusion need not be proved beyond a reasonable doubt. *State* v. *Fauntleroy*, 101 Conn. App. 144, 147–48, 921 A.2d 622 (2007). "[W]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Pauling*, 102 Conn. App. 556, 564, 925 A.2d 1200, cert. denied, 284 Conn. 924, 933 A.2d 727 (2007).

In the case before us, the jury heard testimony that the defendant wanted to injure or to kill Parakilas. The jury also heard Price's testimony that the defendant had told Price that he had somebody follow Parakilas to Steve's Boston Seafood restaurant and Campbell's testimony that the defendant provided detailed information about Parakilas' place of residence. Campbell testified that the defendant "mentioned an address . . . he says the name of a house on a dead-end street, across the railroad tracks. . . . [The defendant] told [Campbell] where [Parakilas] lives. . . . He said it was on a dead-end street, across some tracks and accessible by boat." The defendant also told Campbell that there were bushes on the property that one could go through to get to the house. The jury heard Parakilas' testimony that he frequently patronized Steve's Boston Seafood restaurant. Parakilas also testified that his address and telephone number were not listed publicly, that his residence was located near a waterway, on a cul-de-sac and that one would have to cross over railroad tracks to go from the defendant's residence in Enfield to Parakilas' residence in Suffield.

"[I]t is well established that the jury . . . may accept or reject, in whole or in part, the truth of any witness' testimony." *State* v. *Russell*, 101 Conn. App. 298, 316, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007). Also, "[t]he jury is permitted to consider [a] fact proven and may consider it in combination with other facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Fauntleroy*, supra, 101 Conn. App. 148. Because the defendant knew that Parakilas frequented Steve's Boston Seafood restaurant and the details of Parakilas' home, the jury reasonably could have concluded that the defendant had followed Parakilas or reconnoitered Parakilas' residence. Accordingly, the state presented sufficient evidence to sustain the defendant's conviction of attempt to commit murder and attempt to assault a prosecutor.

B

The defendant further claims that the state presented insufficient evidence to support his conviction of inciting injury to persons.[8] The defendant argues that § 53a-179a requires proof beyond a reasonable doubt of three factors: (1) the speech at issue be directed to incite criminal action, (2) the speech itself be likely to produce the action and (3) the criminal action be imminent. The defendant contends that Campbell's testimony was insufficient to support the inference that he possessed an intent to harm Parakilas because in making the statements by which he intended to solicit Campbell, the

[8] "This state since 1923 has had a statute prohibiting the solicitation of injury to persons or property. See 1923 Public Acts, c. 178, General Statutes (1930 Rev.) § 6072; General Statutes (1949 Rev.) § 8382; General Statutes (1958 Rev.) § 53-44; Public Acts 1969, No. 452, § 9; Public Acts 1971, No. 871, § 52; General Statutes § 53a-179a." *State* v. *O'Neil*, supra, 65 Conn. App. 160 n.15.

defendant knew that, given their history, Campbell would not take any action. Relying on that argument, the defendant claims that the jury reasonably could not have found that the defendant's speech would likely produce criminal action or that the criminal action was imminent. We disagree.

In constructing his argument, the defendant relies on *State* v. *Ryan*, 48 Conn. App. 148, 709 A.2d 21, cert. denied, 244 Conn. 930, 711 A.2d 729, cert. denied, 525 U.S. 876, 119 S. Ct. 179, 142 L. Ed. 2d 146 (1998),[9] and *State* v. *Leary*, 41 Conn. Sup. 525, 536, 590 A.2d 494 (1989).[10] We concluded in *Ryan* that "[t]he published commentary to § 53a-179a . . . persuades us that intent must necessarily be inferred when construing § 53a-179a. . . . The additional requirement that the advocacy be of imminent dangerous action is compelled by relevant constitutional doctrines of free speech. . . . The commission's reference to imminent dangerous action supports the . . . conclusion that intent must be inferred in construing § 53a-179a. Aided by the commentary, we also conclude that the legislature intended the challenged language to proscribe speech only if it supports imminent injurious action." (Citation omitted; internal quotation marks omitted.) *State* v. *Ryan*, supra, 156–57.[11]

---

[9] The defendant quotes from *Ryan*: "[The proscribed speech must be] directed to inciting or producing imminent lawless action and be likely to incite or produce such action." (Internal quotation marks omitted.) *State* v. *Ryan*, supra, 48 Conn. App. 159.

[10] Both *Ryan* and *Leary* involved a constitutional challenge to § 53a-179a. In *Leary*, the trial court concluded that "the requirement of intent that must be read into § 53a-179a preserves the statute from a constitutional demise under the first amendment." *State* v. *Leary*, supra, 41 Conn. Sup. 530. Nine years later in *Ryan*, we restated that conclusion: "We conclude that all of the prohibited verbal acts are saved from vagueness by judicial gloss and the legislature's intent that such acts require an intent to cause injury . . . [and therefore] the statute . . . [bears] a construction that renders [it] free from constitutional defects." (Citations omitted; internal quotation marks omitted.) *State* v. *Ryan*, supra, 48 Conn. App. 156–59.

[11] Furthermore, "[t]he offense made criminal is the incitement to commit an offense and not the commission of the criminal act itself . . . or put

Under this construction, the defendant must have intended to cause injury to Parakilas[12] and must have intended the injury to happen within a short period of time.[13] In the present case, viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant intended to harm Parakilas when he asked Campbell to obtain a gun and offered $5000 to another individual to "whack" Parakilas. Additionally, the jury reasonably could have concluded that the defendant intended the harm to Parakilas to be imminent because it heard evidence that the defendant told Carbone in November, 2002, that "it's all arranged" and that the defendant would need money after the holidays to pay the contract killer. Accordingly, the state presented sufficient evidence to sustain the defendant's conviction of inciting injury to persons.

## II

The defendant next claims that the court improperly instructed the jury on the charge of inciting injury to persons. Specifically, he argues that the court improperly failed to instruct the jury on the essential element

another way, [t]he gravamen of the statutory offense lies in the incitement or encouragement of the commission of the offense even though . . . there may not be an actual assault." (Internal quotation marks omitted.) *State* v. *Leary*, supra, 41 Conn. Sup. 531. Thus, our conclusion in *Ryan* does not require the state to prove that Parakilas actually had been harmed by the defendant or his agents.

[12] "It is well established that the question of intent is purely a question of fact [and] may be . . . inferred from the defendant's verbal or physical conduct [or] from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Salaman*, 97 Conn. App. 670, 677, 905 A.2d 739, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

[13] The Oxford English Dictionary defines imminent as impending, threatening, hanging over one's head, ready to befall or overtake one, close at hand in its incidence, coming on shortly. Oxford English Dictionary (2d Ed. 1989).

of likelihood and mischaracterized the essential element of imminence, and, therefore, it was reasonably possible that the jury was misled. We disagree.

The defendant made the following written request to charge: "In order for you to convict the defendant of this offense as charged in the information you must find that the defendant acting with intent advocated, encouraged, praised, incited and solicited the imminent action to kill or cause injury to an individual, namely . . . Parakilas." At the charging conference, defense counsel added that the court must also define the word "imminent" as "immediate and instantaneous," arguing that conduct that would take place six months after the speech could not be considered imminent. Defense counsel also requested that the court instruct the jury that the solicited action be likely to occur.

The court gave the following jury instructions. "[A]s used in this statement, the word injury means impairment of physical [condition] or pain. The word solicit has its ordinary meaning. The [defendant's] *words pertain to expressions or conduct that have a very substantial capacity to propel action to kill or injure a person. In order for you to convict the defendant of this offense as charged in the Information, you must find that the defendant, acting with the required intent, solicited the imminent action to kill or cause injury to an individual, namely . . . Parakilas.* Thus, in order for you to convict the defendant of this crime, you must find that the defendant's actions must have supported imminent injuring action to . . . Parakilas. This requires that I define for you the word imminent. *The word imminent means about to occur or impending. It does not, however, have a specific time frame associated with it.* Injurious action may not immediately follow the solicitation if it is otherwise imminent. The state must prove beyond a reasonable doubt that the defendant had the intent to cause injury

or death to a person, that is . . . Parakilas. In summary, then, in order to convict, the state must prove beyond a reasonable doubt the following elements: one, that the defendant . . . in public or private, orally or in any other manner, two, acting with the intent to cause injury or death to a person, three, solicited for the killing or injuring of an individual." (Emphasis added.)

The standard of review for claims of instructional impropriety is well established. "The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Blango*, 102 Conn. App. 532, 543, 925 A.2d 1186, cert. denied, 284 Conn. 913, 931 A.2d 932 (2007).

"[W]e must determine whether the court's instructions gave the jury a reasonably clear comprehension of the issues presented for [its] determination under the pleadings and upon the evidence and were suited to guide [it] in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Solomon*, supra, 103 Conn. App. 537.

General Statutes § 53a-179a (a) provides in relevant part: "A person is guilty of inciting injury to persons or property when, in public or private, orally, in writing, in printing or in any other manner, he advocates,

encourages, justifies, praises, incites or solicits . . . the killing or injuring of any class or body of persons, or of any individual." The necessary elements of this crime, which the state was required to prove beyond a reasonable doubt, therefore, were that the defendant (1) in public or private, orally, in writing, printing or in any other manner, (2) advocates, encourages, justifies, praises, incites or solicits, (3) the killing or injury of any class or body of persons, or of any individual. In order to preserve the constitutionality of the statute, our courts have attached a judicial gloss, requiring that the state prove that the defendant intended to cause another to engage in the killing or injuring of another individual, that the defendant's words and acts were directed at soliciting imminent lawless action and that such words and acts likely would produce such action. *State* v. *Ryan*, supra, 48 Conn. App. 159.

The defendant does not take exception to the charge on any of the elements of the offense. Instead, the defendant claims that the court improperly defined "imminent" and improperly failed to instruct the jury that the criminal action must be likely to occur. We conclude that the defendant's claims are without merit because the court properly instructed the jury as the defendant requested. First, the court's instructions that the jury "must find that the defendant, acting with the required intent, solicited the imminent action to kill or cause injury to an individual, namely . . . Parakilas," tracks almost precisely the defendant's written request to charge. Second, even though the court did not use the words "immediate and instantaneous" in its definition of "imminent," the court correctly defined "imminent" as "about to occur or impending."[14] Finally, consistent with the defendant's requested charge that the solicited action must be likely to occur, the court instructed the jury that the solicitation must "have a

---

[14] See footnote 13.

very substantial capacity to propel action to kill or injure a person." We therefore conclude that the defendant's claim lacks merit.

## III

The defendant next claims that the court improperly failed to give, sua sponte, a special instruction regarding the credibility of a jailhouse informant pursuant to *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), which was decided after the defendant's trial.[15] He argues that the court's failure to give the special credibility instruction constituted plain error. We disagree with the defendant and conclude that his claim does not present the type of extraordinary situation that warrants plain error review.

The state presented testimony from Price, who testified that on August 30, 2004, while he and the defendant were in holding cells at a Hartford courthouse, the defendant told him that he had threatened to kill Parakilas and that "he was going to carry out the threats he made against [Parakilas]." Price also testified that the defendant told him that he had somebody follow Parakilas to Steve's Boston Seafood restaurant. Price further testified that he had hoped to receive some benefit for coming forth with the information but that his efforts at garnering any benefits were futile. The court

_____

[15] In *Patterson*, our Supreme Court concluded: "[A]n informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect. . . . Because the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state, we conclude that the defendant was entitled to an instruction substantially in accord with the one that he had sought." (Citations omitted.) *State* v. *Patterson*, supra, 276 Conn. 469–70. In *State* v. *Martinez*, 95 Conn. App. 162, 166 n.3, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006), we rejected the argument that the rule in *Patterson* is of constitutional dimension and should be given retroactive effect.

instructed the jury on the credibility of witnesses generally but did not include a specific instruction regarding the credibility of jailhouse informants. The defendant never requested the instruction.

"The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 240, 881 A.2d 160 (2005). The defendant's claim does not present the type of extraordinary situation that warrants plain error review, and we decline to review it according to this standard. *Patterson*, on which the defendant relies, was decided after his trial. Furthermore, the court did instruct the jury on the credibility of witnesses. The defendant has failed to demonstrate that the claimed error is so obvious that it affected the fairness and integrity of and public confidence in the judicial proceedings, and, therefore, we conclude that he is not entitled to plain error review of his claim.

## IV

Finally, the defendant claims that the court improperly ruled on the admissibility of certain evidence. Specifically, the defendant argues that the court abused its discretion in admitting (1) evidence of prior misconduct and (2) rebuttal testimony by Diane Tracey, his former girlfriend, regarding his conversation with Campbell.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error."

(Citations omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352–57, 904 A.2d 101 (2006).

A

The defendant first claims that the court improperly admitted evidence of prior misconduct by permitting (1) testimony that a large volume of activity on a cellular telephone could be consistent with conducting drug transactions and (2) testimony regarding the defendant's pending assault charge. The defendant argues that the evidence was immaterial and irrelevant, its prejudicial effects outweighed any probative value, and, therefore, the court abused its discretion in admitting the evidence. We disagree.

Generally, "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Conn. Code Evid. § 4-5 (a). Nevertheless, "Connecticut Code of Evidence § 4-5 (b) provides: Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Internal quotation marks omitted.) *State* v. *William C.*, 103 Conn. App. 508, 516, 930 A.2d 753, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007). "The list of exceptions provided in the code of evidence is not exclusive but rather is intended to be illustrative." *State* v. *Martin V.*, 102 Conn. App. 381, 386, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007).

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, [the court has] adopted a two-pronged analysis. . . . First, the evidence must be relevant and

material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"[An appellate court's] standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *William C.*, supra, 103 Conn. App. 517.

1

The defendant argues that the court should have excluded testimony that a large volume of activity on his cellular telephone could be consistent with drug transactions because such testimony was immaterial and prejudicial.[16] The state argues that the court did not abuse its discretion by admitting the testimony because it was relevant to demonstrate that the defendant had the means to commit the crimes charged. The state further argues that the evidence did not unduly prejudice the defendant. We agree with the state.

At trial, the defendant introduced into evidence his cellular telephone records for the dates between November 13 and 18, 2002. To attempt to establish that Carbone may have made unauthorized telephone calls

---

[16] The defendant also argues that the court should not have admitted the evidence because the state failed to provide written pretrial notice of its intent to use such evidence. The record establishes that the defendant introduced the telephone records into evidence and, on appeal, did not cite relevant legal authority to support his argument that the state was required to provide written pretrial notice of its intent to engage in the line of questioning at issue. We therefore decline to review the defendant's argument.

to the defendant on those dates,[17] the defense asked Detectives Nicholas DeJohn and Ian Case whether they had called the numbers on the telephone records in their investigations. Both testified that they had not.[18] The defendant's cellular telephone records revealed that numerous calls were made between November 13 and 18, 2002. For instance, on November 14, 2002, the defendant's telephone was used to make 175 calls. When questioned by the state, DeJohn testified that, having had thirty years of experience as a narcotics officer, narcotics transactions are typically conducted via cellular telephone. Case testified that using a cellular telephone approximately 175 times in a single day would be consistent with a person engaged in drug transactions. The defendant objected to the relevance of these statements. The court overruled the defendant's objections. DeJohn and Case then testified that they had not been investigating the defendant for drug related offenses.

Under the first prong of our analysis, we conclude that the statements admitted by the court were relevant and material to show that the defendant had the opportunity to raise the $5000 he offered to have Parakilas injured or killed. Section 4-1 of the Connecticut Code of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more

[17] The police had instructed Carbone not to contact the defendant without prior authorization.

[18] At trial, Carbone gave conflicting testimony about whether he contacted the defendant without authorization from the police during this time. At various times during trial, the defendant tried to establish that he was intoxicated during the conversations with Carbone regarding the "hit" on Parakilas and when he gave his statement to the police on November 19, 2002. To bolster his argument, the defendant attempted to establish, using his telephone records, that Carbone supplied him with OxyContin at some point during the period from November 13 to 18, 2002, and again on the morning of November 19, 2002.

probable or less probable than it would be without the evidence." In the present case, the jury heard testimony from Campbell that the defendant was willing to pay $2500 as a deposit and a total of $5000 to hire someone to harm Parakilas. The jury also heard the taped conversations, in which the defendant discussed these figures with Carbone.[19]

Therefore, the statements admitted by the court, that the defendant's cellular telephone activities were consistent with the telephone activities of someone conducting drug transactions, were material and relevant to show that the defendant had the opportunity, by selling drugs, to raise the necessary funds to pay somebody to harm Parakilas.[20]

---

[19] A taped conversation between the defendant and Carbone on November 18, 2002, is, in relevant part, as follows:

"[The Witness]: I [got] a f___ing court date dude and I'm looking at like a major, major f___ing charge and you know Parakilas, dude, he's gonna f___ me.

"[The Defendant]: I hear you, come up with the money and I'll come up with the other half and then we gotta make sure we got the other one.

"[The Witness]: Right

"[The Defendant]: That's 1250 a piece."

A taped conversation between the defendant and Carbone on November 19, 2002, is, in relevant part, as follows:

"[The Witness]: [H]ow serious are you about f___ing Parakilas here because if you're dead serious dude, I'll give you the money right away so I don't have to worry about nothing. And I would rather have it done, if you're gonna f___ing have it done dude, have it done before f___ing my court date.

"[The Defendant]: Dude, I ain't got no money man, I ain't got no money and he probably won't even (inaudible) . . .

"[The Witness]: Yeah, but if I give you the money that I mean this is not, how much you want from me 700, 6 something?

"[The Defendant]: Yeah, 2500, I'm not worried about that right now.

\* \* \*

"[The Witness]: [All right], so [all right], then whatever. You don't need the money for Parakilas until after the holidays, right?

"[The Defendant]: Yeah."

[20] Also, by putting his cellular telephone records into evidence, the defendant opened the door to further inquiry into those records. See *State* v. *Morascini*, 62 Conn. App. 758, 766, 772 A.2d 703 ("[a]s a general rule . . . if a party delves into a particular subject during examination, he is said to

In accordance with the second prong of our analysis, we conclude that the probative value of the evidence outweighed its prejudicial effect, and, therefore, the court did not abuse its discretion in admitting the uncharged misconduct evidence. The defendant argues that DeJohn's and Case's statements were highly prejudicial in nature because they portrayed him to the jury as a drug dealer. The defendant's argument is not persuasive because both the defendant and the state presented other evidence that the defendant was addicted to prescription medicine and had engaged in drug transactions over the telephone. The defendant presented witnesses to testify that he was abusing pain medication and that he went to different physicians to acquire OxyContin. Additionally, the taped conversations between the defendant and Carbone, already in evidence, demonstrated that the defendant discussed selling drugs. For example, on the November 18, 2002 tape, the defendant said, "I've gotta get them f___ing things man . . . [s]o, I can sell the motherf___ers. I got no money."[21]

On the basis of our analysis, we conclude that the court did not abuse its discretion in admitting testimony that the defendant's cellular telephone activity was consistent with a person engaged in drug transactions. The

have opened the door for further examination regarding that subject" [internal quotation marks omitted]), cert. denied, 256 Conn. 921, 774 A.2d 141 (2001).

[21] The four taped conversations between the defendant and Carbone indicated that Carbone was to supply OxyContin for the defendant so that he could both use and sell it for money. Carbone testified that the defendant wanted to obtain a large amount of OxyContin from Carbone for resale. Carbone explained that when the defendant said, "I've gotta get them f___ing things man," on the November 18, 2002 taped conversation, the defendant wanted to obtain OxyContin "to sell them, to make money off it." On cross-examination, the defense elicited testimony from Carbone that there had been numerous calls to the defendant from people who were "jonesing," a street term to indicate people who needed drugs. The defense also elicited testimony from Carbone that the defendant was selling OxyContin, Percocets, Flexeril and Valium because he needed money.

evidence admitted satisfies both prongs of the applicable analysis, as it was both relevant and material, and its probative value outweighed its prejudicial effect.

2

The defendant also argues that the court should have excluded testimony regarding his pending assault charge because its prejudicial impact in showing his propensity for violence outweighed its probative value of establishing his motive. We disagree.

In his written statement to the police, which was offered by the state through DeJohn's testimony, the defendant said, "I actually hate [Parakilas] for what he did to my son and also because he did not issue an arrest warrant for a guy who stabbed me during [an] argument I had with him because he had snitched on my son Jeffrey. I was arrested because I struck this guy on the head with a wrench after he stabbed me. . . . I told [Campbell] I hated Parakilas and wanted to see him hurt for what he did to me and my son." The statement was admitted into evidence without objection.

During the redirect examination, DeJohn testified that he was able to confirm the defendant's statement that he was arrested for assault. This time, the defendant objected on the ground that allowing testimony regarding that prior incident would suggest a propensity for violence and would be highly prejudicial to him. The court overruled the objection after determining that any prejudice would be minimal because the evidence was already before the jury in the form of the defendant's statement. The court also instructed the jury that the testimony was "admitted for a limited purpose . . . of showing that certain steps were taken in the officer's investigation, which should be considered for no reason other than that related to any issue as to the extent of [the] completeness of the police investigation."

The state then asked Parakilas about his involvement in the defendant's assault case. The defendant objected to that testimony on the ground of relevance. The court overruled the objection after finding that the evidence corroborated the defendant's statement, was relevant to motive and would have a minimal prejudicial impact. The court again gave the jury a limiting instruction, stating that the evidence was offered to show motive and to corroborate the defendant's statement, and was not to be considered for any other purpose. The defendant's assault charge was again discussed during Price's testimony and the state's cross-examination of the defendant's daughter, Erica Damato. The defendant did not raise further objections.[22]

The first prong of our analysis is satisfied because the parties agree that the statements admitted by the court were relevant and material to show that the defendant had a motive to assault or to murder Parakilas. In accordance with the second prong of our analysis, we conclude that the probative value of the evidence outweighed its prejudicial effect. The defendant's assault charge already was before the jury in his written statement to the police, and the court gave limiting instructions to the jury immediately following the testimony of DeJohn and Parakilas.[23] Therefore, the court did not abuse its discretion in admitting the uncharged misconduct evidence.

[22] Even though the defendant failed to object during the testimony of Price and Erica Damato, we conclude that the defendant's objections to the admissibility of statements regarding his assault charge, raised previously, adequately preserved his claim for appellate review. See *State* v. *Evans*, 10 Conn. App. 605, 607–608, 524 A.2d 1165 (1987) (concluding that all three phrases in prosecutor's summation could be reviewed even though defendant objected to only one at trial).

[23] "Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *William C.*, supra, 103 Conn. App. 520.

## B

The defendant finally claims that the court improperly admitted rebuttal testimony by Tracey regarding his telephone conversation with Campbell. He argues that Tracey's statement confirmed testimony that he had the conversation with Campbell and, therefore, should not have been admitted as rebuttal testimony. We disagree.

At trial, the defendant presented Erica Damato's testimony to show that because of his abuse of pain medication, he was incoherent, rambling and significantly impaired when he made plans to injure or to murder Parakilas.[24] After the defense rested its case, the state indicated that it intended to call the defendant's former girlfriend, Tracey, to rebut Erica Damato's testimony. With respect to the portion of testimony at issue, the state proffered that "[Tracey] will talk about [the] specific conversation [in] which she heard the defendant mention that he had spoken to . . . Campbell about having . . . Parakilas hurt, and she will testify that when he related that information to her, he appeared to be lucid, coherent, able to understand what was going on, and that he was upset, but he did not appear in any way to be under the influence of drugs or alcohol." The defendant objected, arguing that the testimony was not proper for rebuttal. The court overruled the defendant's objection after concluding that the rebuttal testimony was proper to contradict Erica Damato's testimony.

---

[24] Erica Damato testified that "[the defendant] was always on pain medication and not in the right state" and that "he is an angry person . . . he would . . . say a lot of things. . . . I can't give you times and days and who, but he is an angry person." Also, the defendant's friend of more than twenty years, Richard Scott, testified that the defendant abused pain medication and often made threats against different people but that he did not act on those threats. Scott further testified that approximately six months before the defendant's arrest, the defendant threatened to break his leg. He explained that "[the defendant] threatened me, but he never meant anything."

Tracey testified that in the fall of 2002, the defendant was able to function normally and, with respect to his used car business, was able to engage in negotiations and transact business. She also testified that when he discussed harming Parakilas with Campbell over the telephone, the defendant seemed coherent and did not appear to be under the influence of drugs in any way that would impair his ability to understand his speech and his actions.

"Rebuttal evidence is that which is offered to meet new matters raised in [a defendant's case], to contradict prior testimony and to impeach or rehabilitate witnesses . . . . The admission of rebuttal evidence lies within the discretion of the trial court. The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court . . . abused its discretion in . . . allowing the rebuttal testimony . . . ." (Citations omitted; internal quotation marks omitted.) *James* v. *Commissioner of Correction*, 74 Conn. App. 13, 18, 810 A.2d 290 (2002), cert. denied, 262 Conn. 946, 815 A.2d 675 (2003).

Tracey's testimony that the defendant was coherent and lucid when he spoke to Campbell on the telephone was properly offered to contradict Erica Damato's prior testimony. Therefore, we conclude that the court did not abuse its discretion in permitting Tracey's testimony.

The judgment is affirmed.

In this opinion the other judges concurred.